INTAKE

FILED

AO 91 (Rev. 11/11) Criminal Complaint

SEP 26 2019

AUSA Andrew C. Erskine (312) 353-1875

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEP 26 2019

Magistrate Judge Sidney I. Schenkier
United States District Court

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDUARS JACQUIN and<br>PAUL MOSLEY | CASE NUMBER:<br>**UNDER SEAL**<br>19CR 754 |

**CRIMINAL COMPLAINT** MAGISTRATE JUDGE SCHENKIER

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

**COUNT ONE**

On or about May 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, defendants EDUARS JACQUIN and PAUL MOSLEY violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowingly and intentionally distributing a controlled substance; namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance |

**COUNT TWO**

On or about June 28, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, defendant EDUARS JACQUIN violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowingly and intentionally distributing a controlled substance; namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

X Continued on the attached sheet.

STEVEN GONZALEZ
Task Force Officer, Drug Enforcement Administration (DEA)

Sworn to before me and signed in my presence.

Date: September 26, 2019

*Judge's signature*

City and state: Chicago, Illinois

SIDNEY I. SCHENKIER, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, STEVEN GONZALEZ, being duly sworn, state as follows:

1. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), and have been so employed since June 2017. I am currently assigned to the Chicago Field Division, and my responsibilities include the federal investigation of illegal drug distribution and trafficking offenses. In addition to my current DEA assignment, I am employed as a police officer with the Naperville Police Department, and have been so employed for approximately 14 years. In my current position, I am assigned as a narcotics detective with the Special Operations Group where my responsibilities include the criminal investigation of felony cannabis, controlled substance, and weapons offenses.

2. I have received specialized training in the enforcement of laws with regards to controlled substances as found under Title 21 of the United States Code, as well as extensive training from federal, state, and municipal law enforcement agencies in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities. I have testified in judicial proceedings and prosecutions for violations of controlled substances laws, and have been involved in various types of electronic surveillance and debriefings of defendants, witnesses, confidential informants, and sources of information who have knowledge of the distribution and transportation of controlled substances.

3. This affidavit is submitted in support of a criminal complaint alleging that EDUARS JACQUIN and PAUL MOSLEY have violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging JACQUIN and MOSLEY with distributing 50 grams or more of methamphetamine, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

4. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, and information provided by a cooperating individual.

## FACTS SUPPORTING PROBABLE CAUSE

5. In summary, at the direction of law enforcement, a cooperating source ("the CS") made two controlled purchases of methamphetamine (in the form of "crystal meth") from the defendants.[1] First, on or about May 18, 2018, the CS purchased approximately 145 grams of actual methamphetamine for $4,800 from the defendants, and the controlled substance was provided to the CS by PAUL MOSLEY.

[1] The CS has convictions for domestic battery and DUI, as well as arrests for domestic battery, resisting a peace officer, contributing to the delinquency of a minor, residential burglary, retail theft, and assault. The CS began cooperating in or about February 2018 because he/she believed he/she and his/her partner might have criminal exposure for a suspected fraud offense. The CS cooperated because he/she hoped to avoid—or minimize—criminal charges. The CS was ultimately not charged for this suspected conduct. Since that time, the CS has received financial compensation for his/her assistance. To date, the CS has been paid approximately $4,000. The CS has provided information that has proven to be accurate, as corroborated by agents through subsequent agent surveillance, consensual recordings, and controlled purchases.

Second, on or about June 28, 2018, the CS purchased approximately 145.65 grams of actual methamphetamine for $4,000 from EDUARS JACQUIN while MOSLEY was present. In March 2019, JACQUIN and MOSLEY were interviewed by investigators and both men admitted distributing crystal meth, including to the CS.

***On May 18, 2018, a Cooperating Source Made a Controlled Purchase of Methamphetamine from JACQUIN and MOSLEY***

6. Between May 15, 2018, and May 18, 2018, at the direction of investigators, the CS had a text message conversation with JACQUIN in which the CS coordinated the purchase of methamphetamine from JACQUIN, as follows:[2]

Tuesday, May 15, 2018[3]

CS: Yo I'm probabbly gonna stop by Friday afternoon [to purchase crystal meth]

JACQUIN: sounds good, how much [crystal meth do you want to buy]

---

[2] According to the CS, the CS had known JACQUIN personally for approximately two years before the controlled purchase, and the CS had likewise known MOSELY who was JACQUIN's partner. The CS had previously been to MOSLEY and JACQUIN's apartment and observed that both men resided there. The CS identified MOSLEY and JACQUIN in governmental photographs provided by investigators. All of the phone communications referenced in this Affidavit between the CS and JACQUIN took place over the phone 773-600-6904. The CS was provided this number for JACQUIN through a mutual acquaintance. As illustrated below, JACQUIN was confirmed as the user of this phone through the nature of the communications with the CS and the CS successfully purchasing methamphetamine from JACQUIN and MOSLEY.

[3] Any quoted language or transcriptions set forth in this Affidavit are non-final drafts. Summaries, quotations, or transcriptions set forth in this Affidavit do not include all potentially criminal communications, or all statements or topics covered during the course of the conversations. These communications sometimes include my understanding and my fellow agents' understanding of what is being said during such conversations, at times, set forth in brackets. This understanding and interpretation of the conversations is based on (i) the content and context of the conversations, (ii) my experience and my fellow agents' experiences as law enforcement officers, including our experience observing written conversations as a whole, and (iii) the investigation to date.

Wednesday, May 16, 2018

| | |
|---|---|
| CS: | I'll let you know tomorrow for sure then I'll see u friday |
| JACQUIN: | ok cool |
| CS: | Thanks bro |
| JACQUIN: | mofo... I'm moving about 2pounds a week 0_0 [JACQUIN is currently selling about two pounds of crystal meth per week] |
| JACQUIN: | ssssshhhh |
| CS: | Lol damnnnn |

Thursday, May 17, 2018

| | |
|---|---|
| CS: | Yo we good for tommorow around lunch |
| JACQUIN: | how many [ounces of crystal meth do you want] |
| CS: | Im thinking 3 [ounces] maybe more |
| CS: | Is that cool |
| JACQUIN: | how many percentage m u think more? |
| JACQUIN: | like 50% yes 1 or 2 more or 75% 1-2 more? [i.e., how likely is it that you will want additional ounces?] |
| CS: | 50/50 I'll let u know in the am when I get up gotta talk to my guy tomorrow |
| JACQUIN: | cool |
| CS: | I'll hit u up when I wake up |
| CS: | Yooooo |

Friday, May 18, 2018

| | |
|---|---|
| CS: | Can we do 6 [ounces] |
| CS: | Yooooo |
| CS: | Eddie I need to know broski |

| | |
|---|---|
| CS: | Yoooo bro |
| JACQUIN: | yo |
| CS: | Can u do 6 [ounces of crystal meth] |
| JACQUIN: | damn bro 6?!?!?! I would have had 6!!! but inherent [sic] sure... fuuuuuuuckkk [JACQUIN would've obtained six ounces from his supplier if he'd known the CS wanted that much] |
| JACQUIN: | ho .lm d om st [sic] what time are u trying to swing by? |
| CS: | Huh |
| JACQUIN: | I have iop today |
| JACQUIN: | at what time are u trying to come by? |
| CS: | What about paully [can MOSLEY give the CS the crystal meth if JACQUIN can't be present?] |
| JACQUIN: | ok. but at what time are you goin g.g b yo [sic] stop by |
| CS: | Noonish |
| JACQUIN: | I'm trying to see if I can get 3 more [ounces] |
| CS: | How much would I owe u |
| JACQUIN: | if you come at one I can prob. do the other 3 [ounces] |
| JACQUIN: | I have 3 [ounces] right now..... I can do 2500 [$2,500 for the three current ounces] |
| CS: | 6 at 1 |
| JACQUIN: | how much money dkny [sic] have |
| CS: | $4800 |
| JACQUIN: | yeah if u would told me 6 earlier i woulda had it ...I only have 3 right now for $2500 |
| CS: | I need 6 bro |

| | |
|---|---|
| JACQUIN: | 6 is gonna be all 4800 [six ounces of crystal meth will cost $4,800] |
| CS: | That's fine is it shake or shards |
| JACQUIN: | and if u want 6 its gonna have to be at 4pm earliest |
| JACQUIN: | because I have to go to rehab from 12-3 |
| CS: | U can't leave it with Paul? |
| CS: | Can I come right before 12 |
| CS: | Yoooo is that cool to come before u go to iop |
| JACQUIN: | ok... you're gonna have to come and the rest of the order is going to get here while you here..... [the supplier will deliver the additional three ounces while the CS is at JACQUIN and MOSLEY's apartment] |
| JACQUIN: | I leave at 12 hurry... I'll explain here |
| CS: | Ok on my way |
| CS: | U have all 6 tho right |
| CS: | ??? |
| JACQUIN: | ur gonna have to wait here for 15-30 mins for it to get dropped off. |
| CS: | Ok |
| CS: | Be there in a couple min |

7. On or about May 18, 2018, at approximately 11:39 a.m., investigators established surveillance near the 1700 block of West Jonquil Terrace in Chicago, Illinois, in anticipation of the controlled purchase of methamphetamine from JACQUIN and MOSLEY at their shared apartment. At approximately 12:17 p.m., investigators met with the CS at a pre-determined location in the area. The CS and his/her vehicle were searched and found to be free of any contraband. The CS was

equipped with a device for audio and video recording. Investigators provided the CS with $4,800 to conduct the controlled purchase of methamphetamine.

8. At approximately 12:39 p.m., the CS drove from the pre-determined location—followed by investigators—directly to JACQUIN and MOSLEY's shared apartment. The CS exited his/her vehicle and went inside JACQUIN and MOSLEY's residence for approximately 21 minutes. Investigators observed the CS exit JACQUIN and MOSLEY's apartment building and return to his/her vehicle. The CS then drove his/her vehicle directly back to the pre-determined location followed by investigators.

9. At approximately 1:05 p.m., investigators met with the CS at the pre-determined location where the CS's audio and video recording device was removed. The CS provided investigators with a white-colored "Ring" camera box, which contained four clear plastic bags containing a white-colored rock-like substance, believed to be methamphetamine. The substance was subsequently lab tested and found to be 154.3 grams of d-Methamphetamine Hydrochloride with a 98% purity. The CS and his/her vehicle were searched again and found to be free of any contraband.

10. According to the CS, the CS purchased the methamphetamine from MOSLEY for $4,800.

11. Although the audio/video recording did not capture an image of the controlled substance, the audio captured MOSLEY counting out the money.[4] The audio also captured MOSLEY and the CS trying to calculate how many grams were in three ounces; however, they mistakenly concluded that it was 68 grams instead of 84 grams. When the door bell rang—i.e., the supplier bringing the additional three ounces—the CS asked if he/she should go in the room, and MOSLEY responded, "Yeah." The video depicts the CS waiting in a bedroom for approximately two minutes until MOSLEY called for the CS who then left from the room. After the money was done being counted, MOSLEY asked the CS, how much is "three 28s" [i.e., how many grams total is three 28-gram ounces]. Based on my training and experience, I believe MOSLEY was weighing out an additional three ounces of crystal meth using a scale that measured in grams, and MOSLEY wanted to know how many grams total were in three ounces.

12. According to a recording of the call, at approximately 2:05 p.m., JACQUIN called the CS to alert the CS that the CS might be "short" [crystal meth] because JACQUIN had "ended up with extra stuff." JACQUIN informed the CS that the mistake had been thinking that 68 grams equaled three ounces ("Why 68 though? That's where you fucked up.").

[4] I have previously spoken with MOSLEY in person, and I recognize his voice in this recording.

***On June 28, 2018, a Cooperating Source Made a Controlled Purchase of Methamphetamine from JACQUIN***

13. Between June 25, 2018, and June 28, 2018, at the direction of investigators, the CS had a text message conversation with JACQUIN in which the CS coordinated the purchase of methamphetamine from JACQUIN, as follows:

Monday, June 25, 2018

CS: yo is thursday cool for me to stop by

JACQUIN: how many [ounces of crystal meth do you want]

CS: ill know probabbly tomorrow but dont forget u owe me half ounce [referring to the amount of crystal meth the CS failed to receive from MOSLEY on May 18, 2018]

CS: ill let u know but u still got me on my half ounce and the rest of what I need right?

CS: ???

JACQUIN: yeah

CS: ok cool thanks brother talk to u tomorrow

Wednesday, June 27, 2018

CS: yo tomorrow around 12 cool?

CS: yooooo

[CS places phone call to JACQUIN]

CS: i said ill know in the am im meeting with my uncles guy [the CS's purported customer]

CS: because i was short last time im not getting money until the morning so i wont know till tomorrow when i meet up with him

CS: my uncles boy thinks i burned him because i was short why u ignoring me bro

| | |
|---|---|
| CS: | bro wtf i call u in the morning i guess please dont send me off bro |
| JACQUIN: | i gotchu |
| CS: | ight thanks bro |

<u>Thursday, June 28, 2018</u>

| | |
|---|---|
| JACQUIN: | whats up |
| CS: | gimme 10 min with my guy now |
| CS: | i got 4k [$4,000] i need as close to 6 [ounces] as u can get |
| CS: | cuz u owe me a half |
| CS: | is that cool? i'm gunna start heading that way |

[CS places phone call to JACQUIN]

| | |
|---|---|
| CS: | can u do 5 ½ for 4k by 130ish cuz i got shit to do later |
| CS: | i got 5 ½ for 4800 last time |
| CS: | bro i gotta do this soon or [CS's significant other] will think im on bullshit please can u do this |
| CS: | come on bro |
| CS: | i need this or my uncles guy is gunna be pissed |
| JACQUIN: | i cant do it by 130v [sic] |
| JACQUIN: | soonest would be 1:45-2 |
| CS: | thats fine |
| CS: | 5 ½ for 4k? |
| JACQUIN: | its only 5.5 [ounces of crystal meth] becaus einowe [sic] the half |
| JACQUIN: | but yes |
| CS: | ok cool see u then |
| CS: | be there in about 15 min |

14. On or about June 28, 2018, at approximately 10:30 a.m., investigators established surveillance near the 1700 block of West Jonquil Terrace in Chicago, Illinois, in anticipation of a controlled purchase of methamphetamine from JACQUIN and MOSLEY at their shared apartment. At approximately 2:00 p.m., the CS met with investigators at a pre-determined location in the area. The CS and his/her vehicle were searched and found to be free of any contraband. The CS was equipped with a device for audio and video recording. Investigators provided the CS with $4,000 to conduct the controlled purchase of methamphetamine.

15. At approximately 2:20 p.m., the CS drove from the pre-determined location—followed by investigators—directly to JACQUIN and MOSLEY's shared residence in Chicago. Investigators observed the CS exit his/her vehicle and go inside JACQUIN and MOSLEY's residence, escorted by JACQUIN who was waiting outside. The CS was inside the building for approximately 11 minutes. Investigators observed the CS exit JACQUIN and MOSLEY's apartment building—escorted by MOSLEY—and return to his/her vehicle. The CS then drove his/her vehicle directly back to the pre-determined location followed by investigators.

16. At approximately 2:36 p.m., investigators met with the CS at the pre-determined location where the CS's audio and video recording device was removed. The CS provided investigators with two clear plastic bags containing a white-colored rock-like substance, believed to be methamphetamine. The substance was subsequently lab tested and found to be 151.721 grams of d-Methamphetamine

Hydrochloride with a 100% purity. The CS and his/her vehicle were searched again and found to be free of any contraband.

17. According to the CS, the CS purchased the methamphetamine from JACQUIN for $4,000.

18. The audio/video recording shows that both JACQUIN and MOSLEY were present in the apartment, walking around and talking with each other and the CS. After some time passes, JACQUIN is heard saying, "here you go," to which the CS asks, "This is--" JACQUIN responds, "five."[5] Based on my training and experience, I believe this portion of the video depicted JACQUIN handing the crystal meth—which is not pictured—to the CS and informing the CS that it constituted five ounces of crystal meth. Later, the CS asked, "You got something I can put this shit in, Eddy?" To which JACQUIN responded, "Yeah." JACQUIN then asked MOSLEY if he had "anything to put it in." MOSLEY responded but it was unintelligible on the recording.

***On March 12, 2019, Investigators Interviewed JACQUIN and MOSLEY***

19. On or about March 12, 2019, at approximately 10:20 a.m., after having established surveillance near their residence, investigators conducted a traffic stop on a vehicle containing JACQUIN and MOSLEY. JACQUIN and MOSLEY were taken into custody at that time. At approximately 10:28 a.m., speaking in separate locations, investigators advised JACQUIN and MOSLEY of their rights. Both men waived and agreed to speak with investigators at that time.

---

[5] I have previously spoken with JACQUIN in person, and I recognize his voice in this recording.

20. During their respective interviews, JACQUIN and MOSLEY both confirmed they were currently distributing methamphetamine in Chicago. JACQUIN further informed investigators that he had been distributing methamphetamine for approximately one-and-a-half years, and that he had approximately ten customers, including the CS.

***Conclusion***

21. Based on the foregoing, I respectfully submit that there is probable cause to believe that EDUARS JACQUIN (on or about May 18, 2018, and June 28, 2018) and PAUL MOSLEY (on or about May 18, 2018) did knowingly and intentionally distribute a controlled substance; namely, 50 grams or more of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

______________________________________
STEVEN GONZALEZ
Task Force Officer, Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on September 26, 2019.

______________________________________
SIDNEY I. SCHENKIER
United States Magistrate Judge